**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **D. K., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | **NO.  08-cv-4914** |
| | ) | |
| **ABINGTON SCHOOL DISTRICT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                                                   **March 25, 2010**

Before the Court are Plaintiffs' Motions for Introduction of Additional Evidence and for Judgment on the Supplemented Administrative Record and Defendant's Motion for Summary Judgment or Judgment on the Administrative Record.

This civil action arises under 20 U.S.C. §1401 et seq., pursuant to the Individuals with Disabilities in Education Act ("IDEA").  The Court has jurisdiction based on 28 U.S.C. 1331. Under the IDEA, parties who have satisfied the administrative remedies available in their state may file a civil cause of action in the courts of the United States.[1]  The claims giving rise to this appeal have been exhausted at the administrative level by a Pennsylvania Special Education Hearing Officer ("Hearing Officer") and a Special Education Appeals Panel ("Appeals Panel") authorized to hear special education matters.  Testimony and documentary evidence were considered by the Hearing Officer and the Panel, both of which ruled in favor of Defendant Abington School District ("the District"), in accordance with the standards and procedures set

---

[1]        20 U.S.C. § 1415(i)(2005)(defining the right to bring a civil action in any competent state court or in a district court of the United States without regard to the amount in controversy).

forth in the IDEA and the Code of Federal Regulations ("CFR").[2]

Plaintiffs D. K., a Minor, by and through his Parents, S. K. and L. K., ("the Parents") now request reconsideration of the District's alleged refusal to evaluate D.K. and provide him a Free Appropriate Public Education ("FAPE") beginning in September 2004, pursuant to the IDEA and Section 504 of the Rehabilitation Act of 1973 ("Section 504").[3]  Plaintiffs argue that the Hearing Officer and the Appeals Panel committed substantive and procedural errors in reaching their findings, and as such, should be reversed.  In converse, Defendant requests in its Motion that the Court affirm the administrative decisions of the Hearing Officer and Appeals Panel below.

Plaintiffs also seek to introduce two documents as additional evidence to supplement the administrative record: an expert report of Emily Perlis, Psy.D. and the 1995 Guidelines for Effective Behavioral Support of the Pennsylvania Department of Education ("PDE Guidelines").

## I.    FACTUAL AND PROCEDURAL BACKGROUND[4]

D.K. is a student who has attended an elementary school in the District since his kindergarten year in 2003.  D.K. exhibited reading and behavioral difficulties in his first year of kindergarten, which was a half-day program.[5]  In response, the District implemented supports and accommodations for D.K. to address his perceived academic and behavioral limitations.[6]  With

---

[2]    34 C.F.R. §§ 300.500, 502, 503 (2006).

[3]    29 U.S.C. § 794 (2002).

[4]    The facts of this case have been established as findings of fact at the administrative proceedings below and are essentially uncontested by the parties.

[5]    Admin. Record Ex. No. 6, Special Educ. Hr'g Officer Decision at 18 (Hr'g Officer William F. Culleton, Jr., Esq.).

[6]    Id. at 2-3.

the Parents' participation and agreement, Defendant required D.K. to repeat kindergarten in a full-day program for the 2004-2005 school year.[7]  The District commenced Title 1 reading support for D.K. and constructed numerous behavior plans for him from kindergarten through the second-grade.[8]  D.K. improved academically in his second year of kindergarten, but continued to have problems with following rules and self control.[9]  D.K.'s first-grade teacher was able to control his behavior in the classroom, though he still had continued difficulties with following directions and paying attention.[10]

In January 2006, during D.K.'s first-grade year, the Parents requested an evaluation of D.K. for special education eligibility.[11]  In response, the District conducted a comprehensive evaluation.  The resulting Evaluation Report, dated April 24, 2006, concluded that D.K. was ineligible for special education services.[12]  Suzanne Grim, Ph.D., a certified school psychologist in the District with specialized training in the identification and diagnosis of ADHD, administered the April 2006 Evaluation.[13]  In assessing D.K.'s learning abilities, Dr. Grim performed a cognitive assessment and concluded that D.K.'s score fell in the low-average range; Dr. Grim believed that this score was an accurate indication of D.K.'s IQ score of 83, as it was

---

[7]      Admin. R. Ex. 2, Special Educ. Op. 1900, *1 (July 25, 2008).

[8]      Admin. R. Ex. 10, Hr'g Tr. at 651.

[9]      Hr'g Officer Decision at 2.

[10]      Id. at 18-19.

[11]      Hr'g Officer Decision at 4.

[12]      Id. at 7.

[13]      Admin. R. Exs. 11 and 12, Hr'g Tr. at 106-107, 148, 192-193 (The administrative record reflects that Dr. Grim has a Master's in psychology and a Ph.D. in school community and clinical psychology, both from the University of Pennsylvania. Dr. Grim is also experienced in the diagnosis of ADHD, having spent a year in the ADHD and Learning Disabilities Disorder Clinic at the Children's Hospital of Philadelphia and has contributed to publications on the topic of ADHD).

within a few points of what was reflected through two Cognitive Abilities Test ("CogAT") administrations.[14]  In addition to the cognitive assessment, Dr. Grim used a visual-motor integration test ("VMI") to assess D.K.'s skills in that area.[15]  Results from the VMI standardized test also indicated that he was in the low-average to average range.[16]

As part of the 2006 Evaluation, Dr. Grim observed D.K.'s classroom behavior in his first grade class and integrated those observations with her observations previously noted during his full-day kindergarten class.[17]  Dr. Grim noted that D.K.'s concentration and attention level appeared age appropriate.[18]  In preparing the Evaluation Report, Dr. Grim used the Behavior Assessment System for Children ("BASC") rating scale to determine whether D.K. had ADHD.[19]  The rating scale reflected that D.K. did not show elevated scores in two or more settings and that he was not in the "at risk" or "clinically significant" ranges.[20]  The 2006 Evaluation did not include a functional behavioral assessment.[21]  Upon completion of Dr. Grim's analysis, Parents signed a Notice of Recommended Education Placement ("NOREP"), approving the April 2006 evaluation.[22]

During D.K.'s second-grade, in the 2006-2007 school year, D.K. received 180 minutes

---

[14]      Admin. R. Ex. 11, Hr'g Tr. at 215-216.

[15]      Hr'g Officer Decision at 6.

[16]      Admin. R. Ex. 11, Hr'g Tr. at 220.

[17]      Hr'g Officer Decision at 6.

[18]      See e.g., Admin. R. Ex. 14, S-7.

[19]      Admin. R. Ex. 11, Hr'g Tr. at 204-206.

[20]      Id.

[21]      Admin. R. Ex. 9, Hr'g Tr. at 695.

[22]      Hr'g Officer Decision at 7.

per week of reading support and 30 minutes per week of math support.[23]  D.K.'s report card

grades improved as compared with the previous year.[24]  On May 12, 2007, however, the Parents

had D.K. evaluated privately by a licensed audiologist.[25]  On June 26, 2007, the Parents obtained

a private scoring of an attention deficit disorder scale, which indicated that D.K. was moderately

atypical for attention problems, with subscales indicating markedly atypical scores for behavioral

control.[26]  All test scores were eventually provided to the District and in July 2007, the Parents

asked the District to provide a second educational evaluation of D.K.[27]

D.K.'s third-grade, 2007-2008, started and continued well.  The Parents were pleased

with D.K.'s academic and behavioral progress under the guidance of a teacher the Parents helped

to select.[28]  Despite D.K.'s improved behavior, Parents obtained a private pediatric neurological

evaluation in September 2007.  The resulting report supported a diagnosis of Attention Deficit

Hyperactivity Disorder ("ADHD").[29]  In November 2007, the second special education

evaluation performed by District resulted in D.K. being identified as a student with "Other

Health Impairment", eligible for special education services under the IDEA.[30]  On November 30,

---

[23]     Admin. R. Ex. 2, Special Educ. Op. 1900 at 2.

[24]     Id.

[25]     Admin. R. Ex. 11, Hr'g Tr. at 232-233, 344-347.

[26]     Hr'g Officer Decision at 8.

[27]     Hr'g Officer Decision at 9 (Parents did not share the audiologists' report with the District until the summer of 2007).

[28]     Admin. R. Ex. 11, Hr'g Tr. at 397 (In March 2007, Parents contacted the Principal to express their dissatisfaction with D.K.'s second-grade teacher and requested a meeting for the selection of D.K.'s third-grade teacher.  One of the results of the meeting was that the Principal arranged for Parents' teacher preference to be D.K.'s third-grade teacher).

[29]     Hr'g Officer Decision at 9.

[30]     Id. (the same school psychologist, Dr. Grim, who conducted the April 2006 Evaluation, conducted the November 2007 Evaluation on behalf of the District).

2007, the District convened an Individualized Education Program ("IEP") team meeting to discuss the second evaluation and plan a formal program for D.K.[31]   In February 2008, the parties revised the IEP slightly and after some "fine-tuning", the Parents signed the NOREP on March 25, 2008, approving the plan and thereby agreeing to the now contested educational placement and program for D.K.  The IEP included educational goals in line with the November Evaluation Report March 25, 2010 for occupational therapy, reading comprehension, written expression, and on-task behaviors.[32]

On January 8, 2008, in the midst of finalizing their approval of the IEP, the Parents, on behalf of D.K., requested a special education due process hearing pursuant to the IDEA and Section 504, seeking compensatory education for the period of September 2004 (the date District allegedly failed to identify D.K. as needing special education services) through March 12, 2008.[33] Parents alleged that the District improperly delayed identifying D.K. as a special education student and then, once having made the identification in 2007, the District offered him an inappropriate educational placement and program.  At the hearing, Plaintiffs also sought reimbursement for an Independent Educational Evaluation ("IEE") that Parents privately funded in September 2007.

On June 14, 2008, after conducting four hearings between March 18, 2008 and May 14, 2008, the Hearing Officer denied Plaintiffs' claims in their entirety.  The Hearing Officer found, in pertinent part, that (1) the District's decision not to evaluate D.K. for special education eligibility prior to 2006 did not violate its Child Find obligations under IDEA and Section 504;

---

[31]     Id. at 11.

[32]     Special Educ. Op. 1900 at 4.

[33]     Plaintiffs' Section 504 claims are premised on their IDEA claims - the administrative record does not contain a separate claim of disability discrimination under Section 504.

(2) the District's initial Evaluation Report was appropriate; (3) the PDE Guidelines were inadmissable; (4) the relevant time period for Parents' compensatory education claims ended on January 8, 2008; (5) the limitations period in IDEA-2004 is applicable[34]; (6) the District's November 15, 2007 IEP was appropriate; and (7) D.K. was not entitled to compensatory education.[35]

Parents timely appealed the Hearing Officer's determinations to the Appeals Panel. Based on the totality of the record, the Panel found no abuse of discretion, and affirmed the Hearing Officer's findings on July 2008.[36]  Plaintiffs did not offer expert testimony or a report at either level of the administrative proceedings.

Plaintiffs thereafter filed the instant action "requesting review and reversal of the Hearing Officer and Appeals Panel decisions regarding their application of a statute of limitations and on the merits of Plaintiffs' remaining claims", and seeking compensatory damages as well as reasonable attorneys fees under the IDEA and Section 504.[37]

The Court has carefully reviewed Plaintiffs' Motion for Introduction of Additional Evidence[38]; Plaintiffs' Motion for Judgment of the Supplemented Administrative Record[39]; Defendant's Motion for Summary Judgment or Judgment on the Administrative Record and Defendant's Response in Opposition to Plaintiffs' Motion for Introduction of Additional

---

[34]    Effective July 1, 2005, IDEA-1997 was amended and entitled IDEA-2004.

[35]    Hr'g Officer Decision at 28-29.

[36]    Special Educ. Op. 1900 at 13.

[37]    Complaint [Document No. 1].

[38]    Document No. 15.

[39]    Document No. 16.

Evidence and For Judgement on the Supplemented Administrative Record[40]; Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Introduction of Additional Evidence[41]; Plaintiffs' Response to Defendant's Motion for Summary Judgment or for Judgment on the Administrative Record[42]; and Plaintiffs' Response to Defendant's Motion for Summary Judgment or Judgment on the Administrative Record and Reply to Opposition to Plaintiffs' Motion for Introduction of Additional Evidence[43] and all accompanying materials, and this matter is now ready for disposition.

## II.  LEGAL STANDARD

Civil actions brought under the IDEA require a standard of review for summary judgment that differs from the traditional inquiry into genuine issues of material fact.[44]  Under the IDEA, the reviewing court of "any action brought... (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."[45]  This standard, generally referred to as a "modified *de novo*" review of the factual findings of the administrative hearing officer, affords those findings "due weight."[46]  When

---

[40]     Document No. 18.

[41]     Document No. 21.

[42]     Document No. 22.

[43]     Document No. 26.

[44]     Fed. R. Civ. P. 56 ("the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").

[45]     20 U.S.C. § 1415(i)(2)(C).

[46]     Lauren W. ex rel. Jean W. v. Deflamanis, 480 F.3d 259, 266 (3d Cir. 2007) (quoting S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 269 (3d Cir. 2003)).

reviewing an administrative proceeding in an IDEA case, the district court should "defer to the hearing officer's factual findings", unless it can point to contrary non-testimonial extrinsic evidence in the record.[47] This requires the court to consider factual findings made in the administrative process to be *prima facie* correct. The Court is required to provide an explanation if it chooses not to accept these factual findings.[48] The district court, however, is not bound by the hearing officer's conclusions of law.[49]

A party filing suit under the IDEA is entitled to request the reviewing court to consider additional evidence pursuant to 20 U.S.C. §1415(e)(2). It is left to the discretion of the reviewing court to determine whether to admit that additional evidence.[50] A court choosing to hear additional evidence is "free to accept or reject the agency findings depending on whether those findings are supported by the new expanded record and whether they are consistent with the requirements of the IDEA."[51] A reviewing court must determine whether the party introducing the additional evidence has presented sufficient justification for not proffering the evidence at the administrative hearing.[52] The court must consider the party's request to admit additional evidence, may not summarily reject the request, and may use and weigh such evidence in its sound discretion.[53] The district court "must use particularized discretion in its ruling so that it will consider evidence relevant, noncumulative, and useful evidence in

---

[47]  Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995).

[48]  S.H., 336 F.3d at 269-270.

[49]  See Id.

[50]  Scott P., 62 F.3d at 527; S.H., 336 F.3d at 270.

[51]  Id.

[52]  Antoine M. v. Chester Upland Sch. Dist., 420 F. Supp. 2d 396, 403 (E.D. Pa. 2006).

[53]  Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 760 (3d Cir. 1995).

determining whether Congress' goal has been reached for the child involved."[54]

## III. DISCUSSION

### A. IDEA Limitations Period and Section 504 Tolling

#### (i) The IDEA

Plaintiffs argue that the Hearing Officer improperly applied the IDEA's statute of limitations and that the limitations period should not be applied retroactively to claims arising prior to the Act's July 1, 2005 effective date.[55] Plaintiffs also contest the Hearing Officer's decision to limit the relevant time period for Parents' compensatory education claims to end on the date the due process complaint was filed, January 8, 2008. To support its position, Plaintiffs largely rely upon Tereance D. v. Sch. Dist. of Philadelphia.[56]

Unlike the facts before this Court, in Tereance D. the court addressed the applicability of a change in the statute of limitations to an action that was currently pending. Here, however, the due process action was initiated in 2008, well after the effective date of IDEA-2004.[57] Thus, the reasoning underlying the court's conclusion reached in Tereance D., is inapplicable here.[58] Based on the undisputed time line established in the administrative record, the Court is in full agreement with the Appeals Panel's conclusion that Plaintiffs' "limitations period" argument is

---

[54]    Id.

[55]    See 20 U.S.C. § 1415(f)(3)(c)(the 2004 amendment of the IDEA added a two-year limitation period for parents to request a due process hearing).

[56]    570 F.Supp.2d 739 (E.D. Pa. 2008).

[57]    See Special Educ. Op. 1900 at 5.

[58]    See P.P. ex rel. Michael P. v. West Chester Area Sch. Dist., 557 F. Supp. 2d. 648, 659-660 (E.D. Pa. 2008), aff'd in part, reversed in part; summ. J. aff'd, 585 F.3d 727 (3d. Cir. 2009); Evan H. v. Unionville-Chadds Ford Sch. Dist., 2008 U.S. Dist. LEXIS 91442 at *8-12 (E.D. Pa. Nov. 4, 2008); see also Lawrence Township Bd. of Educ. v. New Jersey, 417 F.3d 368, 370 ( 3d Cir. 2005) (amendments to IDEA have prospective application only).

"frivolous, unreasonable, and without foundation."[59]

Plaintiffs also argue that the Hearing Officer erred in failing to apply the two statutory exceptions to the IDEA-2004 statute of limitations. The exceptions allow no limitations period for compensatory education claims where: (1) the District made specific misrepresentations to parents that the child was making educational progress and (2) the District withheld information that it was obligated to provide the parents.[60] Plaintiffs first contend that four years passed during which D.K. failed to make meaningful education progress before the District addressed the problems despite the fact that the District "continually advised" the Parents that D.K.'s "academic, behavioral, and social deficits could be addressed with the District's...support plans"; consequently, the Parents claim to have been misled into believing the District was providing their son a FAPE.[61] This assertion, however, is contrary to the uncontested hearing testimony.[62] Second, Plaintiffs contend that in failing to provide Parents "with an appropriate evaluation of D.K.'s educational needs, the District withheld information" that prevented Parents from filing a due process request. This argument is also not supported by any facts found within the administrative record. Third, Plaintiffs contend that the District withheld from Parents the fact that they had a right to request an evaluation, resulting in Parents not knowing of this right until December 2005, "two and a half years after [D.K.] began exhibiting academic, social, and behavioral difficulties."[63] Plaintiffs' argument is counterproductive because, as admitted in their

---

[59]     See Special Educ. Op. 1900 at 7.

[60]     20 U.S.C. § 1415(f)(3)(D).

[61]     Pls. Mot. for J. at 8-9.

[62]     See e.g., Admin. R. Ex. 10 and 11, Hr'g Tr. at 201-203, 264-296, 302-309, 314-315, 317, 363-364, 422-429.

[63]     Pls. Mot. for J. at 9.

Motion, Parents submitted a written request for an evaluation in January 2006, without intervention, encouragement, or notice to do so from the District.[64] Based on the record, the Court agrees with the Hearing Officer's finding that the District was not obligated to provide Parents with notice concerning their right to request an educational evaluation, nor did the District withhold information from Parents regarding D.K.'s right to an educational evaluation.[65] The Court further finds that Plaintiffs' complaint, the administrative record, and Plaintiffs' Motion, are devoid of facts that would support the Court's consideration of either of the two statutory exceptions to the IDEA two-year limitation period for requesting a due process hearing.

### (ii)    Section 504

Plaintiffs assert that the Hearing Officer and Appeals Panel erred by failing to apply tolling principles to Plaintiffs' Section 504 claims. While Section 504 does not contain its own express statute of limitations, the Third Circuit has held that the IDEA's two-year statute of limitations applies to Section 504 claims made for education.[66] Plaintiffs, nonetheless, argue that the limitations period should be equitably tolled.

The Third Circuit has determined that equitable tolling principles are applicable "only when the principle of equity would make the rigid application of a limitation period unfair...[which generally] will occur when the [plaintiff] has in some extraordinary way been prevented from asserting his rights."[67] Here, Plaintiffs assert that they were misled by

---

[64]    See Id. at 19. Parents' Motion offers no explanation of how they learned of their right to request an evaluation, nor why they decided to request an evaluation at that time.

[65]    See Hr'g Officer Decision at 16.

[66]    P.P.v. West Chester Area Sch. Dist. , 585 F.3d 727, 737 (3d. Cir. 2009).

[67]    Jones v. Morton, 195 F.3d 153, 159 (3d Cir. 1999) (quoting Miller v. New Jersey Dep't. of Corrections, 145 F.3d 616, 618) (three extraordinary circumstances warrant tolling: (1) defendant actively misled plaintiff; (2) plaintiff had in some extraordinary way been prevented from asserting his rights; or (3) plaintiff had

Defendants, but fail to support their accusation with any facts. The Court agrees with the Hearing Officer's finding that Parents failed to prove any misrepresentation. Furthermore, despite Plaintiffs' arguments, the Court finds that the evidence does not support a showing of a continuing violation. Accordingly, the Court finds it proper to limit Plaintiffs' request for relief to the period from January 8, 2006 through January 8, 2008, the date of Parents' request for a due process hearing.

## B.    Child Find Obligations[68]

A determination of whether the District failed to identify a student eligible for special education services in a timely fashion requires a finding that the District knew, or should have known, that the child was disabled or in need of special education.[69] Plaintiffs assert that the District failed in its Child Find duties by not conducting a special education evaluation of D.K. until 2006, when D.K. was in his third year with the District. Plaintiffs' target D.K.'s retention in kindergarten in 2004 as the point when the District allegedly had reason to suspect that D.K. needed a special education evaluation. Parents offer conference reports submitted by D.K.'s first and second grade teachers to the Principal as evidence that the District knew or should have known that D.K. was a student with a disability prior to January 2006.

Defendant counters that when it evaluated D.K. in 2006, the results determined that D.K. was in fact not eligible for special education services at that time. Defendant further contends

timely asserted his rights mistakenly in the wrong forum).

[68]    The IDEA includes a Child Find mandate, which requires school districts to identify, locate, and evaluate all children with disabilities, regardless of the severity of their disabilities. This obligation to identify all children whom may need special education services exists even if the school is not providing special education services to the child.

[69]    M.C., 81 F.3d at 397.

that it "complied with its Child Find obligations throughout all relevant times, but significantly from the time period of January 8, 2006 through November 2007, when D.K. was found to be eligible for services under the IDEA."[70]  Relying on the testimony of Dr. Kline, Principal of D.K.'s elementary school; Nancy Goldstein, the District's Reading Specialist[71]; and D.K.'s second-grade teacher, Defendant asserts that prior to the diagnosis of ADHD, the District had no basis to believe that D.K. was an individual who had a physical or mental impairment that substantially limited one or more of his major life activities, especially given his tender of age of five years, considering that "...children at that age need to be given some time developmentally, and opportunity to grow" and his "behavioral issues did not cause him to 'stand out to be any different than the whole 18 [other students in the class.]'"[72]  Defendant also contends that while D.K. did exhibit some problems in the first-grade with regard to listening, following directions, and organizational skills, "D.K.'s teacher addressed those concerns with his parents, and implement[ed] accommodations to address the issues."  In addition, D.K.'s "parents acknowledged that Daniel made progress with [his first-grade teacher]" and that his "behavior improved greatly in first grade."[73]  Likewise, D.K.'s second-grade teacher adequately addressed D.K.'s behavioral problems through interventions in the classroom and continued "close contact with the parents."[74]  Consequently, the Court finds that even though Dr. Grim acknowledged in hindsight that D.K. did exhibit some behaviors consistent with ADHD prior to his diagnosis, this

---

[70]    Def.'s Mot. at 24.

[71]    See Admin. R. Ex. 9, Hr'g Tr. at 735 (Ms. Goldstein worked with D.K. during his full-day kindergarten year).

[72]    Def.'s Mot. at 25.

[73]    Id. 25-26.

[74]    Admin. R. Ex. 10, Hr'g Tr. at 517-519.

disclosure does little to inform the Court's current analysis, given the complexities of an ADHD diagnosis, coupled with the assessment that Daniel also exhibited general behavioral characteristics typical of five or six year old children.[75]

Without signs of a disability at the relevant times, the Court agrees that prior to receiving a diagnosis of ADHD and conducting its second evaluation, the District had insufficient reason to believe that D.K. was a student with a mental impairment that substantially limited one or more of his major life activities. The Court agrees with the Hearing Officer's logic that one must take into account the fact that children develop cognitively and socially at different rates. In this instance, the problems experienced by D.K., which later triggered a second special education evaluation, were not so pronounced in his earlier development.[76] As such, the Court affirms the Hearing Officer's finding that the District fully complied with the pertinent regulations with regard to its Child Find obligations.

### C. FAPE Program and Placement

The IDEA confers the right to a FAPE to children who are determined to be disabled.[77] In support of this right, Section 504 prohibits federally funded agencies from denying a FAPE on the basis of a child's disability.[78] A student's right to FAPE under both the IDEA and Section 504 is contingent upon the child's classification as having a disability.

---

[75] Admin. R. Ex. 11, Hr'g Tr. at 164-165 (Dr. Grim testified at the administrative hearings that the "diagnosis of ADHD has indicators or behaviors that need to be kept in perspective with what's developmentally appropriate for a child's age....Most five, six, seven year olds [have difficulty sitting still,...impulsive, blurt out answers...interrupt others]" as did D.K.).

[76] Hr'g Officer Decision at 18.

[77] 20 U.S.C. §§ 1400(d) and 1412(a)(1)(A)(2005); See Schaffer ex. rel. Schaffer v. West, 546 U.S. 49, 60-61 (2005) (the IDEA was intended by Congress to place as much emphasis on compliance with procedures as it did upon the substance of the IEP, giving the parents a large measure of participation in both).

[78] 29 U.S.C. § 794 (2002).

To determine whether a child has a disability as defined by the IDEA, the statute requires that the school perform an evaluation consisting of a variety of assessment tools and strategies to gather information about the student, including information from the student's parents, and information about the student's progress in the general education curriculum.[79]  The District is obligated to use more than one measure and assessment for determining whether the student has a disability, and must use technically sound instruments that can assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.[80]  Additionally, as part of the evaluation, the administrator must review existing data including information provided by parents, current-classroom-based observations, and observations by teachers and/or related service providers.[81]

Once identified as a child with a disability as defined by the IDEA, each student is entitled to services designed to address that child's individual needs as specified in the child's IEP.  The IEP is created by the child's parents/guardian in conjunction with a IEP Team, consisting of at least one classroom teacher, one special education teacher, a representative of the educational agency who is qualified and knowledgeable about the curriculum, and an individual who can interpret the instructional implications of evaluation results.[82]  Any time the IEP Team decides to change the child's IEP, including placement, identification, or goals, adequate notice

---

[79]     20 U.S.C. § 1414(b)(2)(2005).

[80]     Id.

[81]     Id. at § 1414(c)(1)(A).

[82]     Id. at § 1414(d)(1)(A)(i-vi) and § 1414(d)(1)(B)(the IEP must include a statement of: (1) the child's present levels of educational performance. . . ; (2) measurable annual goals, including benchmarks or short term objectives. . . ; (3) the special education and related services to be provided to the child; (4) explanation of the extent, if any, to which the child will not participate with nondisabled children [in activities]...; (5) how the child's parents will be regularly informed . . . ; and (6) how the child's progress toward the annual goals will be measured).

in writing must be given to the parents describing why the change is necessary or appropriate.[83] This notice is generally referred to as a NOREP.  In order to meet the statutory requirements of FAPE under the IDEA, school districts must: (1) conform to the procedural requirements of the Act; and (2) ensure that the eligible student's IEP is reasonably calculated to yield a meaningful benefit.[84]  When a school district fails to provide a FAPE, compensatory education is an available remedy.[85]

If a child's parents disagree with the results, they may request a reevaluation and the IDEA requires that the school district or other public agency promptly comply.[86]  Once the reevaluation is complete, the parents may object to all or part of the findings, and may request that an IEE be conducted at public expense.[87]  The CFR specifies the procedures that the school district must follow in order to fulfill this obligation.  The public agency (the District here) "must, without unnecessary delay, either (i) file a due process complaint to request a hearing to show that its evaluation is appropriate; or (ii) ensure that an independent educational evaluation is provided at public expense."[88]

Section 1415(f)(1)(B)(ii) states that "if the local agency has not resolved the complaint to the satisfaction of the parents within 30 days of receipt of the complaint, the due process hearing may occur, and all of the applicable time lines for a due process hearing...shall commence."

---

[83]     Id. at § 1415(b)(3).

[84]     See Board of Educ. Of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-207 (1982).

[85]     M.C. v. Central Regional Sch. Dist., 81 F.3d 389, 397 (3d Cir. 1996).

[86]     20 U.S.C. § 1414(a)(2)(A)(ii).

[87]     32 C.F.R. § 300.502(b)(1).

[88]     Id. at 300.502 (b)(2).

With respect to allegations of procedural violations of the IDEA at the due process hearing, the Hearing Officer may find that a violation occurred only when the result prevents the child from receiving a FAPE.[89]  There are only three ways to find a procedural violation of FAPE; if the violation: "(i) impeded the child's right to a free appropriate public education; (ii) significantly impeded the parents' opportunity to participate in the decision making process. . . ; or (iii) caused a deprivation of educational benefits."[90]

Defendant asserts in its Motion that it provided a FAPE to D.K. beginning in November 2007, when D.K. was first identified as a disabled student in need of special education services, and that it was not required to provide a FAPE prior to November 2007.  Defendant argues alternatively, that even if it could be determined that the District owed D.K. a FAPE prior to November 2007, the District complied with its obligations during this time period as well.  The Court will address Defendant and Plaintiffs' arguments regarding D.K.'s FAPE below.

(i)    *Initial Evaluation Report*

Plaintiffs assert that the Hearing Officer wrongfully concluded that the District's April 24, 2006 Evaluation Report was appropriate because the report "...failed to include a variety of assessment tools and strategies to gather relevant academic and functional information to be able to make a determination regarding whether [D.K.] was a child with a disability, in violation of IDEA."[91]  Plaintiffs further assert that "the District's school psychologist relied on only the BASC rating scales of only one of [D.K.]'s teachers... [and].... ignored the behavior ratings

---

[89]    20 U.S.C. § 1415(f)(3)(E).

[90]    Id.

[91]    Pls. Mot. for J. on the Supplemented Admin. R. at 20.

[provided by D.K.'s] mother and teacher..."[92]  The administrative record reflects, however, that

the District's school psychologist evaluated D.K.'s cognitive, academic, and behavioral

functioning using multiple and varied kinds of data sources to form her opinions, to include the

BASC, comprehensive review of records, observation reports from D.K.'s teachers and Parents,

as well as her own personal observations of D.K.[93]

Plaintiffs also claim that D.K. is entitled to compensatory education for the time period

when D.K.'s behavior and grades declined in second-grade and Parents began to seek private

help for him.  Plaintiffs further claim that the District responded inappropriately to D.K.'s

behavior by failing to conduct a functional behavioral analysis as part of the 2006 special

education evaluation.  Although a functional behavioral analysis could arguably be performed by

a school district as a matter of good practice, the IDEA only requires such analysis when a child

has been identified with a disability and has an IEP in place, yet still displays behavioral

problems.[94]  Despite Plaintiffs' assertion, the District was not required to conduct a functional

behavioral analysis of D.K. in 2006 because he had not been identified as a special needs child by

either the school district or private experts.[95]

The Court concurs with the Hearing Officer's conclusion that the presence of any

problematic behavior does not automatically require a functional behavior analysis under the law.

The administrative record reflects that the District responded proactively to D.K.'s academic and

behavioral problems beginning in his first year of kindergarten, and then with Parents' approval,

---

[92]     Id. at 21.

[93]     Hr'g Officer Decision at 22.

[94]     See 20 U.S.C. § 1415(k)(1)(D).

[95]     See Id. at § 1400(c)(3) and § 1415(k)(1)(D).

the District retained D.K. for a second year of kindergarten wherein he began receiving Title 1 reading support and his teacher began implementing behavior modification plans.[96]  With this additional support, the record reflects that D.K. attained sustainable progress.[97]  As such, the Court concurs with the Hearing Officer's finding that the District's April 2006 evaluation met all of the criteria set forth under the law for an appropriate evaluation, consistent with the mandates of the IDEA.

### (ii)   Re-evaluation and IEP

Plaintiffs challenge the appropriateness of the program and placement offered to D.K. during his third-grade year (the 2007/2008 school year) and assert that the Hearing Officer wrongfully concluded that the District's November 15, 2007 IEP was appropriate as it "was not reasonably calculated to confer meaningful progress...[and] failed to include the necessary elements to ensure [measurable progress]."[98]  Plaintiffs further assert that D.K. is entitled to compensatory education because the District "...failed to timely identify and...provide appropriate programs and placements for [D.K.] from May 14, 2004 to March 12, 2008...."[99]

Plaintiffs' arguments, however, are not supported by the administrative record.  Parents testified during the administrative hearing that the District had in fact provided D.K. with an appropriate education throughout the 2007/2008 school year and that significant behavioral progress had been made, even prior to his IEP in March of 2008.[100]  Moreover, the Parents agreed

---

[96]     See e.g., Admin. R. Ex. 10, Hr'g Tr. at 491-493, 501, 513-514, 592.

[97]     Id. (aside from needing improvement in following directions, D.K. exhibited progress and improvement throughout each section on his report card for the 2005/2006 school year).

[98]     Pls. Mot. for J. at 22.

[99]     Id. at 24.

[100]     Admin. R. Ex. 10, Hr'g Tr. at 473, 476-477.

with and approved the Districts' program and placements plans for D.K. when they signed the 2006 and 2008 NOREPs. The administrative record reflects that the IEP addressed D.K.'s needs in reading comprehension, writing, organization, listening, and attention, with measurable goals to attain the baselines.[101] While the District's Re-Evaluation Report could have arguably included more detail, it was not required by law to do so. As such, the Court concurs with the Hearing Officer's findings that the IEP was responsive to the Parents' desires regarding placement for D.K. The Evaluation Report addressed D.K.'s deficiency between ability and achievement in reading skills, identified that he had a specific learning disability, and used a number of reliable tests in finding so. This was more than sufficient information from which the IEP Team could create an adequate IEP for D.K.

Moreover, even if this Court were to conclude that a procedural violation had occurred, that violation must also impede D.K.'s right to a FAPE.[102] The administrative record well documents that both the Parents and the District collaborated in their efforts to address D.K.'s developmental needs, and later his disability challenges, as the need manifested itself, all in accordance with the rules and regulations. The Parents agreed with the District's actions regarding behavioral plans and programs implemented for D.K., as evidenced by their agreement to have D.K. repeat kindergarten in a full-day program and their signing of the 2006 and 2008 NOREPs. Without a clear effect on D.K.'s FAPE, the Court cannot find that any procedural violation occurred. Additionally, the Court concurs with the Hearing Officer and the Appeals Panel's opinion that Plaintiff is not entitled compensatory relief because the District did not deny D.K. a FAPE, which is a necessary prerequisite for the equitable remedy of compensatory

---

[101] See e.g., Admin. R. Ex. 14, S-42.

[102] See 20 U.S.C. §1415(f)(3)(E)(ii).

education.

**D.    Plaintiffs' Motion for Introduction of Additional Evidence**

Plaintiffs seek to introduce two additional pieces of evidence to supplement the administrative record.  The Court will discuss each separately below.

*(i)    Plaintiff's Expert Report*

Plaintiffs did not present their expert report prepared by Dr. Emily Perlis ("Report") to the Hearing Officer or the Appeals Panel.  Plaintiffs, nonetheless, now urge the Court to consider its Report on the basis that "Dr. Perlis carefully addressed [D.K.]'s progress during each of the school years in question and gave an opinion as to the appropriateness of the District's action at each point in time given the information available to Defendant at the time."[103]  Plaintiffs assert that they did not present an expert witness at the administrative proceedings because of "the short period of time to prepare for a due process hearing in Pennsylvania" and because of the "costliness of expert reports."[104]

In accordance with 22 Pa. Code §14.162(q), a due process hearing shall occur within 30 days after the parents' initial request and the hearing officer may grant an extension of time beyond this period at the request of either party.[105]  Here, the Parents never requested an extension of time for the hearing.  As Defendants' assert, Plaintiffs could have either retained an expert in advance of the initial hearing request, or requested an extension of time for the due process hearing beyond the 30 days, in accordance with 22 Pa. §14.162(q)(3).  Plaintiffs,

---

[103]    Reply to Def.'s Opp'n to Pls.' Mot. for Intro. of Additional Evidence at 3; the Court also notes Plaintiffs' most recent letter filing dated March 11, 2010, inviting the Court's attention to <u>Breanne C. v. S. York County Sch. Dist.</u>, 2010 WL 773945 (M.D. Pa. Feb. 26, 2010) wherein the district court granted the plaintiff's motion for introduction of additional evidence.

[104]    Mem. of Law In Supp. of Pls.' Mot. for Intro. of Additional Evidence at 5.

[105]    22 Pa. Code § 14.162(q)(2008).

however, did neither.

Plaintiffs bear the burden of persuasion on this issue, yet Plaintiffs have not provided the Court with sufficient information to meet that burden. For instance, Plaintiffs' Motion is silent as to when they first consulted with an expert. Likewise, the Motion is sparse as to the potential prejudice that presenting an expert report at this stage may have on the Defendant. Additionally, the Report is cumulative of the same documents previously introduced at the administrative proceeding and explained by witnesses on both sides during the Due Process Hearing.

As to Plaintiffs' explanation of "costliness of expert reports" as the basis for not offering an expert report at the administrative proceedings, the Court cannot permit Plaintiffs' request to supplement the administrative record with expert testimony proffered for the first time to support the same substantive claims previously reviewed twice at administrative proceedings below, at the risk of Defendant being unfairly prejudiced. Therefore, the Court declines to admit Plaintiffs' expert report as additional evidence.

*(ii)  PDE Guidelines*

At the administrative proceedings, the Hearing Officer determined that Plaintiffs' proffered PDE Guidelines were inadmissable evidence based on a lack of relevance.[106] Plaintiffs now urge the Court to consider the guidelines on the basis that the document demonstrates that the "District's behavioral support strategies offered to [D.K.] failed to include the necessary components as set forth in [the] PDE Guidelines", thereby denying him a FAPE...[107] Plaintiffs argue that "...the Hearing Officer incorrectly balanced 'the amount of litigation that a given issue

---

[106]     Admin. R. Ex. 9, Hr'g Tr. at 692 (as part of his admissibility analysis, the Hearing Officer considered the prospect of needing to hear from other witnesses to address whether the Guidelines, which are dated 1995, were still considered effective given amount of the time that had passed since its publication).

[107]     Mem. of Law In Supp. of Pls.' Mot. for Intro. of Additional Evidence at 7.

will cause and the importance of that issue to one of the parties that seeks to litigate that issue'....

[and]...failed to consider the May 6, 2008 letter from the Pennsylvania Department of Education,

which...indicate[ed] that the Guidelines are still considered effective."[108]

Having reviewed Plaintiffs' supplemental exhibits C and D (the PDE Guidelines and a

letter dated May 6, 2008 from the Pennsylvania Department of Education, respectively), the

Court accepts the PDE Guidelines as current through the date of the May 6th letter.  Relevancy,

however, is another matter.  Upon examination of the document, the Court concurs with the

Hearing Officer's and Appeals Panel's findings that the PDE Guidelines do not represent binding

compilations of strategies and/or methods that the District was mandated to follow.  Rather the

Guidelines should be viewed as mere recommendations and suggested best practices.[109]  Having

considered Plaintiffs' argument in support of PDE Guidelines, the Court finds that Plaintiffs have

not met their burden of persuasion as to the relevance of the PDE Guidelines to the Court's

review of the administrative proceedings.  Therefore, the Court declines to admit the PDE

Guidelines as additional evidence.

### E.       Request for IEE Reimbursement

Plaintiffs' seek reimbursement costs for the IEE that Parents privately funded.  In

accordance with the CFR, once the evaluation is complete, the parents may object to all or part of

the findings, and may request that an IEE be conducted at public expense.[110]  Here, Parents

requested a reevaluation for special education eligibility by the District in July 2007.  Instead of

waiting for the District to complete its evaluation, the Parents obtained their own private medical

---

[108]     Id. at  9; See Pls.' Mot. for Intro. of Additional Evidence, Ex. D.

[109]     See Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 591 (3d Cir. 2000) (guidelines promulgated by state department of education did not establish law and were not binding on the school district).

[110]     32 C.F.R. §300.502 (b)(1).

diagnosis of ADHD in September 2007. It is undisputed that the District was timely in completing its re-evaluation, which was finalized in November 2007. Accordingly, the Court finds that Plaintiffs did not follow the process required under IDEA, and as such, are not entitled to reimbursement of the privately funded IEE.

## IV.   CONCLUSION

Based on a review of the record in its entirety, the Court finds that the Hearing Officer and the Appeals Panel's findings and conclusions were sound and supported by proper evidence establishing that the District acted appropriately and in accordance with both the IDEA and Section 504. No non-testimonial evidence exists in the record to contradict those findings, to include the additional evidence submitted by Plaintiffs for the Court's review.

For these reasons, the Court finds that there is no clear error in the Panel's affirmation of the Hearing Officer's decisions. Affording those decisions their due weight, the Court hereby affirms the administrative decisions made by the Hearing Officer and will not disturb the factual findings and conclusions of law made by the Hearing Officer or the Appeals Panel. The Court denies Plaintiff's Motion for Judgment on the Supplemented Record, awards no reimbursement costs for the IEE to Parents, and grants Defendant's Motion for Judgment on the Administrative Record.

An appropriate order follows.